# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| GERMAN M. BONILLA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 19-0718 (ABJ) |
| | ) | |
| MERRICK GARLAND | ) | |
| United States Attorney General, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>MEMORANDUM OPINION</u>

Plaintiff German M. Bonilla filed a three-count complaint against defendant U.S. Attorney General Merrick Garland alleging employment discrimination and retaliation. Compl. [Dkt. # 1]. The Court previously dismissed plaintiff's count of retaliation for failure to state a claim and part of his claim of discrimination under Title VII for failure to exhaust administrative remedies. *See* Mem. Op. & Order [Dkt. # 38]. What remains are two counts relating to his June 2014 applications for a GS-13 position with the Department of Justice Housing and Civil Enforcement Section. Plaintiff claims he was denied the position due to race and national origin discrimination in violation of Title VII of the Civil Rights Act, 1964, 42 U.S.C. § 2000e, *et seq*., and age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 631, *et seq*. ("ADEA").

The parties have filed cross-motions for summary judgment on the two remaining claims, Counts II and III. *See* Def.'s Mot. to Dismiss or for Summ. J. (Corrected Version) [Dkt. # 23-1] ("Def.'s Mot.") and Supporting Mem. of P. & A. [Dkt. # 23-2] ("Def.'s Mem."); Pl.'s Opp. & Mot. for Summ. J. [Dkt. # 27] ("Pl.'s Opp."); Def.'s Reply [Dkt. # 32]. For the following reasons, the

Court will grant defendant's motion for summary judgment and deny plaintiff's cross-motion for summary judgment.

## FACTUAL BACKGROUND

Plaintiff German Bonilla is a "GS-12 Civil Rights Analyst/Equal Opportunity Coordinator" at the Civil Rights Division of the Department of Justice.  Compl. at 1; Def.'s Statement of Material Facts [Dkt. # 23-3] ("Def.'s SOF") ¶ 1.  He was born on September 6, 1969, is from the Dominican Republic, and is fluent in both English and Spanish.  Compl. at 2–3; Def.'s SOF ¶ 2.

### I.     Bonilla's Employment History with the Department

When Bonilla filed this lawsuit in 2019, he had been with the Civil Rights Division for more than fourteen years.  Compl. at 2.  Division employees "may apply for lateral transfer to other Sections within the Division" in a process known as Open Season, which allows employees to "widen their horizons and have a change of environment."  Compl. at 4 n.1; *see also* Def.'s SOF ¶ 11. Plaintiff has successfully transferred jobs using the Open Season process and, as a result, he has worked in a number of sections within the Division.  He worked in the Voting Rights Section from April 2004 to January 2006, the Housing and Civil Enforcement Section ("HCE") from January 2006 to May 2010, the Office of the Special Counsel for Immigration Related Unfair Employment Practices from May 2010 to April 2011, and the Voting Rights Section again from April 2011 to at least 2014.  *See* Compl. at 3, 4, 4 n.1, 6; Def.'s SOF ¶ 10; Ex. N to Pl.'s Opp. at PDF Page 165–167 of 179 ("Bonilla Resume").[1]

---

1       "PDF Page" refers to the page numbers imprinted at the top of a document by the Electronic Case Filing system when it is filed with the court.  This page number will be used when citing to exhibits that have multiple page and Bates numbers.

In April 2009, when Bonilla was working in HCE, his supervisor Darryl Foster gave him an "excellent," and not the higher "outstanding," rating for his annual review.  He was not promoted from GS-12 to GS-13, even though, according to plaintiff, Foster had told him six months earlier he was on track to earn the grade promotion.  Pl.'s SOF [Dkt. # 27] at 5.[2]  In July 2009, Bonilla and two of his HCE colleagues filed a complaint with the Office of the Inspector General against Foster, asserting that he had engaged in travel and contract fraud and other unethical acts.  Compl. at 3; Def.'s SOF ¶ 4.  Separately, in November 2009, plaintiff filed an informal complaint alleging race or national origin discrimination and retaliation in connection with the failure to promote, which settled in early 2010.  Compl. at 3; Ex. A to Pl.'s Opp., Settlement Agreement & Release of EEO Compl.; Def.'s SOF ¶ 6.

In January of 2010, before he transferred to another office in the Division, plaintiff had an exit interview with HCE Section Chief Steven Rosenbaum, during which, he asserts, he expressed his disappointment with management's handling of the Foster matter.  Compl. at 3.  As chief of the section, Rosenbaum was aware of Bonilla's 2009 OIG and EEO complaints.  Ex. H to Def.'s Mem., Aff. of Steven Rosenbaum (May 5, 2015) ("Aff. of Rosenbaum") at 4.  In April 2010, Bonilla was called back to HCE for his 2009–2010 annual review, and he again received an "excellent" annual review but was not promoted to GS-13.  Pl.'s SOF at 6; Def.'s SOF ¶ 8.

---

2       Plaintiff, who is proceeding *pro se*, included his Statement of Facts within his opposition brief.  Pl.'s Opp. at 5–8.  Defendant asserts that plaintiff did not comply with Local Rule 7(h) because he did not present a separate, concise Statement of Facts, so the Court should deem defendant's Statement of Material Facts as admitted.  Def.'s Reply at 4.  The Court finds plaintiff's use of a header to identify his three-and-a-half page Statement of Facts within his opposition brief sufficiently separate, concise, and identifiable to satisfy the purposes of the Local Rule and so declines to accept defendant's Statement of Facts as admitted.  *See Haines v. Kerner*, 404 U.S. 519, 520 (1972) (per curium); *Taylor v. U.S. Prob. Office*, 409 F.3d 426, 428 (D.C. Cir. 2005) (holding that the pleadings of *pro se* litigants are "held to less stringent standards than formal pleadings drafted by lawyers").

## II.     Bonilla's 2014 Application for the Testing Coordinator Position

### A.     Open Season Application

Four years later, during the 2014 Open Season, Bonilla applied to transfer within the Division, for jobs including a position as a testing coordinator in HCE.  Pl.'s SOF at 7; Def.'s SOF ¶ 9.  The Director of the Housing Testing Program, Daniel Yi, interviewed plaintiff for the position in March 2014.  Pl.'s SOF at 7; Def.'s SOF ¶ 12.  During Open Season, HCE Section Chief Rosenbaum told Yi's supervisor, Shina Majeed, that plaintiff's "performance did not qualify him for a promotion to GS 13 during his past employment with the section."  Pl.'s SOF at 7; Def.'s SOF ¶ 26.  HCE did not hire Bonilla or the one other candidate who applied for the position through Open Season.  Pl.'s SOF at 7; Def.'s SOF ¶¶ 17, 19.

Yi and Majeed instead decided to publish the job vacancy to the public to obtain a broader pool of applicants.  Pl.'s Opp. at 2; Def.'s SOF ¶¶ 20–21, citing Ex. D to Def.'s Mot., Aff. of Yi (Jun. 9, 2015) at 9 ("Majeed and I made this decision.  I feel that it was appropriate to broaden the pool of applicants."); Ex. E to Def.'s Mot., Aff. of Majeed (Jun. 12, 2015) at 8 ("Yi and I determined that we wanted to expand the search externally to view as broad a pool of applicants as possible.").

In May of 2014, plaintiff filed an EEO complaint because he was not hired for the position during Open Season.  Compl. at 4.   The Department dismissed the complaint in September 2014 as untimely.  *See* Ex. B to Compl., Agency's Brief in Opp. to Appeal at 1–2 (stating the Department dismissed plaintiff's EEO complaint as untimely).

### B.     USA Jobs Application

When HCE sought to elicit applications from the public for the testing coordinator job, it advertised the position on USAJobs.gov.  *See* Pl.'s SOF at 7; Def.'s SOF ¶ 29.  It published two job announcements:  one under the Delegated Examining Unit ("DEU") and the other under the

Merit Promotion Program ("MPP").  Def.'s Reply at 13.  The MPP job announcement was for applicants who were current federal employees, and the DEU job announcement was for applicants who were not current federal employees.  Compl. at 5; Def.'s Reply at 13.  According to Human Resources ("HR") staffer Betsy Allen federal employees could apply to both job announcements "to increase their chances of being referred for consideration and to use their vet[eran] status," since veterans receive priority consideration under the DEU process.  Email from Allen to Yi (Aug. 12, 2014), Record of Investigation Case II [Dkt. # 37-1] ("ROI")[3] at PDF Page 725 of 934; Def.'s Reply at 13.

It was the responsibility of HR to review and identify the "best qualified" candidates from both sets of incoming applications and provide those applications to HCE.  *See* Aff. of Rosenbaum at 7.  The packet of applications provided by HR is referred to as a "certification" or "certificate."  *See id.* at 4.  HCE could then hire a candidate "from any of the certificates (MPP or DEU)" that it received from HR.  Ex. P to Pl.'s Opp., Email from Allen to Yi (July 28, 2014).

To review the incoming certificates from HR, HCE established a Resume Review Committee ("RRC").  Pl.'s SOF at 8; Def.'s SOF ¶ 33.  It was made up of an HCE attorney, Beth Frank, and three Test Coordinators:  Carla Herbig, Lauyren Lewton and Joy Larry.  Email from Yi to Mark Bailey, Kareem Duncan, Herbig, Larry, Lewton, and Garland Woodruff, copying Majeed and Frank (June 23, 2014), ROI at PDF Page 504 of 934; Def.'s SOF ¶ 33.  Also, an Interview Committee was established to interview the candidates recommended by the RRC.  *See*

---

3       Because of its length, the Record of Investigation of plaintiff's September 2014 EEO case appears on the docket as four exhibits.  The documents cited from the ROI appear in the first exhibit of the filing.  *See* Large Additional Attachs. [Dkt. # 37-1].

Pl.'s Opp. at 5; Def.'s SOF ¶ 33.  The Interview Committee was comprised of Yi, Majeed, and three test coordinators.  *See* Pl.'s Opp. at 5; Def.'s SOF ¶ 33.

On June 24, 2014, Bonilla submitted applications for the testing coordinator position under both the MPP and DEU job announcements.  Pl.'s SOF at 7; Def.'s SOF ¶ 30.

### 1.    The Resume Review Committee's Initial Review

On August 7, 2014, after it had reviewed the certificates provided by HR, the Resume Review Committee advised Yi that it had a list of seven candidates it would recommend interviewing and wanted to discuss "next steps" with him.  Ex. E to Pl.'s Opp. ("Pl.'s Ex. E"), Email from Frank to Yi, copying Herbig, Lewton, and Larry (Aug. 7, 2014).  The email did not identify the seven candidates.  *See id.*  Despite that email, RRC members were still discussing who to recommend five days later.  On August 12, 2014, Herbig and Larry proposed a list of six candidates, which included Bonilla, to the other committee members.  *See* Pl.'s Ex. E, Email from Herbig to Frank, and Lewton, copying Larry (Aug. 12, 2014) ("Hello all, Joy and I met on the candidates and are recommending that we put forward the following people to the interview committee:  German Bonilla [other candidate names redacted].").  They exchanged emails that day about whether to recommend an applicant with a J.D., and late in the day, Joy Larry wrote Frank and Yi, stating that she "just had a chance to a look at the applications and to speak to Carla [Herbig] today" about her recommendations, and asking whether her recommendations were going to be included.  Pl.'s Ex. E, Email of Larry to Frank and Yi, copying Herbig and Lewton (Aug. 12, 2014).  Yi responded a few minutes later:  "Beth [Frank] told me the resume review committee was waiting to provide the final recommendations until you had a chance to weigh in, so no recommendations have been made yet."  Pl.'s Ex. E, Email of Yi to Larry, Lewton, and Frank, copying Herbig (Aug. 12, 2014).

### 2.       The Re-Evaluation of the DEU Certificate

The following week, on August 18, 2014, Yi emailed Section Chief Rosenbaum about the

certificate of candidates they received from the DEU job announcement:

> The resume review committee has completed its review of the resumes.
> The head of the resume review committee (Beth Frank) has indicated that
> for Announcement Number 14-CRD-002 (DEU) (the announcement for
> non-federal applicants, where veteran's preference applies), we received
> a total of fourteen (14) applications deemed "best qualified," and all are
> veteran's preference candidates.
>
> Based on Beth's review of these applicants, she determined that none of
> the veteran's preference candidates met the critical criteria we set forth in
> our announcement.  Namely, none of the fourteen applicants have had
> prior experience . . . .
>
> In short, the best qualified candidates for this position are those who have
> had prior experience working as a fair housing test coordinator.  Here,
> none of the 14 provided candidates meet this basic criteria.  Therefore, I
> recommend   seeking   a   re-evaluation   of   the   candidate   pool   for
> Announcement Number 14-CRD-002 (DEU) to find those applicants who
> meet the criteria described above.

Email from Yi to Rosenbaum, copying Frank and Majeed (Aug. 18, 2014), ROI at PDF Page 566

of 934.

Rosenbaum agreed, forwarding Yi's email to HR the next day, stating "[f]or the reasons

described below, we do not believe any of the 14 candidates designated as 'best qualified' merit

that designation."  Email of Rosenbaum to Linda Gaither (Aug. 19, 2014), ROI at PDF Page 571–

72 of 934; Aff. of Rosenbaum at 7 ("There were concerns that the Human Resources office did

not   correctly   apply   the   standards   for   determining   the   best   qualified   candidates   on   the

non-governmental certification(s) because candidates on the original certification(s) did not have

prior testing experience.").

Supervisory HR Specialist Delicia Taylor responded to Rosenbaum on September 8, 2014:

"I reviewed the applications referred to you and agree with your request for a second review.  I

asked Betsy to review the applications again because I did not see where many of the applicants referred had any relevant experience.  I also feel some of the applicants were referred to you at the incorrect grade levels."  Email of Taylor to Rosenbaum and Majeed, copying Gaither (Sept. 08, 2014), ROI at PDF Page 571 of 934.

Bonilla had experience as a testing coordinator when he worked at HCE from 2006 to 2010, *see* Bonilla Resume, though the record does not show whether Bonilla was in the initial DEU certificate or not.

Plaintiff refers to this re-evaluation of the DEU certificate as the "do-over."  Pl.'s SOF at 7.

### 3.     The Resume Review Committee's Second Review

On September 23, 2014, the RRC received a new batch of applications from HR.  Email of USAStaffingOffice@opm.gov (Sept. 23, 2014), ROI at PDF Page 590 of 934.   Beth Frank forwarded it to the other RRC members on September 26, 2014, writing that "[a] lot of the candidates overlap with those we reviewed previously.  However, after just a quick glance I can see that there are some new applicants that we did not previously receive - some of whom appear to have testing experience."  Email from Frank to Herbig, Larry, Lewton, copying Yi and Majeed (Sept. 26, 2014), ROI at PDF Page 590 of 934.  Frank flagged twenty new resumes in the pile: "below is a list of all of the applicants we reviewed last round.  I put a star next to all of the applicants who we also received for the second round - and have added a new list at the bottom of new applicants whose resumes we have not yet reviewed.  It looks like there are 20 new resumes that need to be reviewed."  Email of Frank to Herbig, Larry, and Lewton, copying Yi (Sept. 26, 2014), ROI at PDF Page 591 of 934.  On September 30, Frank emailed again:  "I just finished reviewing them – and there are between 5–7 new candidates that seem to have current and/or very recent experience as test coordinators."  Email of Frank to Herbig, Larry, and Lewton (Sept. 30, 2014), ROI at PDF Page 599 of 934.

On October 2, 2014, Frank emailed Yi and Majeed on behalf of the RRC, proposing seven applicants to interview.  The list did not include plaintiff.

> Following our second round of applications - and a review of a total of 58 applicants for the Fair Housing Testing Program Test Coordinator position - we propose interviewing the following 7 individuals:
>
> 1. [REDACTED]
>
> 2. [REDACTED]
>
> 3. [REDACTED]
>
> 4. [REDACTED]
>
> 5. [REDACTED]
>
> 6. [REDACTED]
>
> 7. [REDACTED]
>
> We received three applications from former DOJ Test Coordinators. While we think these former DOJ test coordinators have significant experience as test coordinators, we feel it would be better to interview applicants with "fresh blood."  Therefore, all of the applicants we have selected to interview (excluding [REDACTED]) have worked or are currently working as test coordinators for state and local testing groups.
>
> Please let us know if we can provide you with additional information about our selections.  Thanks,
>
> Beth, Carla, Joy and Lauyren

Ex. M to Pl.'s Opp., Email from Frank to Majeed and Yi, copying Herbig, Larry, and Lewton (Oct. 2, 2014) ("Pl.'s Ex. M").

Majeed replied that same day:

> Hi, Beth:
>
> Thank you. We should be Interviewing the candidates who are best qualified for the job, based on the written job description and posting, irrespective of whether or not they worked here before.  In light of this,

> could you please revisit with the committee whether this changes your
> recommendation on the interviews?
>
> Thanks,
>
> Shina

Pl.'s Ex. M, Email from Majeed to Frank and Yi, copying Herbig, Larry, and Lewton (Oct. 2, 2014).

Majeed's response led to a series of emails among the RRC members about whether their task was to identify candidates with recent testing experience, as opposed to any testing experience, and how that affected their list of candidates.

- Lewton: "I still agree with our decision and the list that we made." Pl.'s Ex. M, Email of Lewton to Frank, copying Herbig and Larry (Oct. 3, 2014).

- Frank: "I think we had agreed that that the candidates we selected were the best qualified - we just wanted to explain why we didn't think the former FHTP applicants were 'best Qualified.'" Pl.'s Ex. M, Email of Frank to Herbig, Larry, and Lewton (Oct. 3, 2014).

- Herbig: "I thought our charge was to find 5–7 candidates with testing experience who would bring a fresh approach to the team?  In that case, I would stand with our original selections.  If it's identifying people with any testing experience, then we would have to include the former FHTP staff, as well as some of the other candidates that we did not put forward (like [one candidate] who has 14 years of testing experience and [another candidate] who was the ED of the fair housing group)." Pl.'s Ex. M, Email from Herbig to Frank, Larry, and Lewton (Oct. 6, 2014).

On October 6, the RRC asked Majeed and Yi to clarify.  "[I]t was the understanding of the resume panel that our charge was to find 5–7 candidates with housing testing experience who would bring a fresh approach to the FHTP and be a good fit for the team.  If that is the case, then we stand by the candidates presented.  However, if this is not the case, please let us know and we will revisit our recommendations." Pl.'s Ex. M, Email of Herbig to Majeed and Yi, copying Larry, Lewton, and Frank (Oct. 6, 2014).

Yi responded that "[a]t both the resume stage and the interview stage, we should select the candidates who best meet the criteria in the job announcement." Email of Yi to Herbig and Majeed, copying Larry, Lewton, and Frank (Oct. 6, 2014), ROI at PDF Page 612 of 934. The committee asked how many candidates it could recommend and was told "7 is the maximum number of candidates that can be interviewed." Email of Herbig to Frank, Larry, and Lewton (Oct. 6, 2014), ROI at PDF Page 829 of 934.

With this, the RRC continued to discuss which candidates to recommend. Frank wrote, "[i]f we are limited to 7 candidates – I'm happy with the applicants we selected and think they meet the criteria." Email of Frank to Herbig, Larry, and Lewton (Oct. 6, 2014), ROI at PDF Page 829 of 934. Herbig proposed a list of seven that included plaintiff: "[A]fter reviewing the applications again and making a chart based on fair housing testing experience (years and how recent) and any other added value . . . this is how the top 7 shake out for me." Email of Herbig to Frank, Larry, and Lewton (Oct. 6, 2014), ROI at PDF Page 829 of 934.

The committee then exchanged emails about the seventh candidate to recommend.

- Frank: "The only suggested change that Carla [Herbig] made to our original proposed list was to remove [one candidate] - who only has 1.5 years of testing experience and last did testing in 2010 - and replace her with German Bonilla - who has 4.4 years of testing experience and last did testing in 2010 for FHTP. My preference would be to keep [the other candidate] - she was originally at the top of our list when we had our first list of candidates, and German was towards the bottom. I know - Carla - that you have worked with German in the past - so If you feel that h[is] experience here trumps that of [the other candidate's] 1.5 years - than I will go with your suggestion. However, if I had my choice, I would prefer to propose 8 - and use our list that we sent up at the end of last week and add German to that list." Email of Frank to Lewton, Herbig, and Larry (Oct. 6, 2014), ROI at PDF Page 828 of 934.

- Herbig: "[I]f we are forced to recommend only seven (as Dan had told me yesterday), then based only on the job announcement requirements and the resumes submitted, then I believe we are obligated to recommend Bonilla instead of [the other candidate]. Although, he would not be my candidate based on past job performance, that is not what was asked of us in reviewing the applications (as

clarified by Shina)." Email of Herbig to Frank, Lewton, and Larry (Oct 7, 2014), ROI at PDF Page 827–28 of 934.

- Lewton: "I think we should submit the eight, and make a note that we were a split decision between the two remaining candidates and therefore are putting forth 8 candidates. I don't think German would make it through the interview process so I don't think it's fair to recommend him over someone who potentially could get the job, therefore I would like to put forth 8 candidates and they can work with those." Email of Lewton to Herbig, Frank, and Larry (Oct. 7, 2014), ROI at PDF Page 827 of 934.

- Larry proposed a list of seven candidates that included Bonilla and argued for a different eighth candidate than the other committee members had proposed. Email of Larry to Lewton, Herbig, and Frank (Oct. 7, 2014), ROI at PDF Page 827 of 934.

Given the split in the committee about the seventh and eight candidates to recommend, Frank proposed solving the issue by putting forth only six candidates, and the others agreed. *See* Emails (Oct. 7, 2014), ROI at  PDF Page 843 of 934.

On October 7, the committee proposed "interviewing the following 6 candidates who we believe are best qualified for the job, based on the written job description and posting." Email from Frank to Majeed and Yi, copying Herbig, Larry, and Lewton (Oct. 7, 2014), ROI at PDF Page 848 of 934. The slate of six did not include Bonilla. Ultimately, the position was offered to one of the six candidates on December 15, 2014. Compl. at 9; Def.'s SOF ¶ 31.

Plaintiff contends it is reasonable to believe that Majeed conveyed Rosenbaum's "command" during Open Season not to hire Bonilla "to her direct subordinate, Mr. Yi," Pl.'s Opp. at 5, and that during the public hiring process, "management intervened and manipulated the process to keep Bonilla from making it to the interview phase of the process." *Id.* at 8.

## PROCEDURAL HISTORY

On September 2, 2014, plaintiff filed an EEO complaint "after hearing that the applications forwarded by HR to the Resume Committee had no qualified applicants and they were doing it all over again." Pl.'s SOF at 7; *see* Ex. I to Def.'s Mem., Compl. of Discrimination (Sept. 2, 2014).

The Department conducted an investigation into plaintiff's September 2014 EEO complaint, and on March 15, 2015, it dismissed the matter.  *See* Report of Investigation, ROI at PDF Page 2–22 of 934 ("Report of Investigation"); Decision (Mar. 10, 2015), ROI at PDF Page 141–45 of 934.[4]  As part of that investigation, it obtained affidavits from Bonilla, Rosenbaum, Majeed, Yi, and the RRC members, among others.  *See* Report of Investigation at ROI at PDF Page 4–17 of 934.

On March 14, 2019, plaintiff filed this lawsuit.  *See* Compl.  Count I alleged that Rosenbaum, Yi, and Majeed knew about plaintiff's prior claims against the agency for discrimination and retaliated against him by failing to promote him to the GS-13 position during Open Season in 2014, and by "manipulating a Do Over" in the USAjobs.gov process.  Compl. at 10.  On May 10, 2021, defendant filed a motion to dismiss, or in the alternative, for summary judgment.  Def.'s Mot.  On June 2, 2021, plaintiff filed a cross-motion for summary judgment and opposition to defendant's motion.  Pl.'s Opp.  On June 3, 2021, the Court ordered that plaintiff's motion for summary judgment be held in abeyance pending resolution of the motion to dismiss. *See* Min. Order (June 3, 2021).  On August 2, 2021, defendant filed a reply brief.  Def.'s Reply [Dkt. # 32].

On September 17, 2021, plaintiff filed 4,252 pages of "Large Additional Exhibits."  The first is plaintiff's timeline of events.  Large Additional Exhibits [Dkt. # 35].  The second is the Record of Investigation of his EEO complaint concerning his 2014 Open Season application.  Large Additional Exhibits [Dkt. # 36].  The third is the Record of Investigation of his EEO complaint concerning the public hiring process.  Large Additional Exhibits [Dkt. # 37].

---

4      The full Record of Investigation appears at ROI at PDF Page 1–3659.

On April 29, 2022, the Court ruled on defendant's motion to dismiss.  Mem. Op. & Order [Dkt. # 38].  The Court dismissed the retaliation claim in Count I because plaintiff failed to allege facts that demonstrated causation.  *Id.* at 12–14 (ruling that plaintiff's alleged protected activity that took place in 2009 was too attenuated from the alleged failure to promote that occurred in 2014 to demonstrate causation).  It granted summary judgment to defendant in part on Count II, finding that plaintiff failed to exhaust his administrative remedies as to the portion of the count concerning his February 2014 Open Season application.  *Id.* at 14–25 (finding that plaintiff's administrative EEO claim relating to the Open Season application submitted was untimely).

The ruling permitted two claims to proceed, both of which relate to plaintiff's applications through the public hiring process:  the first alleging race and national origin discrimination in violation of Title VII in Count II and the second for age discrimination in violation of the ADEA in Count III.  *Id.* at 24.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  To defeat summary judgment, the non-moving party must "designate specific facts showing that there is a genuine issue for trial."  *Id.* at 324 (internal quotation marks omitted).  The existence of a factual dispute is insufficient to preclude summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A dispute is "genuine" only if a reasonable fact-finder could find for the non-

moving party; a fact is only "material" if it is capable of affecting the outcome of the litigation. *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987).  In assessing a party's motion, the court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the summary judgment motion.'"  *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alterations omitted), quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam).

## ANALYSIS

The claims that remain to be resolved relate to plaintiff's application for the HCE testing coordinator job through the public hiring process.  With the "retaliation/reprisal" allegation already dismissed, the Court turns to what plaintiff refers to as his "secondary charges."  Pl.'s Opp. at 1. "Bonilla asserts that National Origin and Age discrimination may be in play.  [He] believes that HCE Chief Steven Rosenbaum reached out to the decision-makers" to undermine his applications because plaintiff "embarrass[ed] Rosenbaum by engaging in protected activities under Title VII and union activity about a HCE supervisor in 2009."  Pl.'s Opp. at 2.

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment" because of the individual's race or national origin, 42 U.S.C. § 2000e-2(a)(1), while the ADEA makes it unlawful to discriminate with respect to these aspects of employment because of the individual's age. 29 U.S.C. § 623(a).  "Under Title VII [and] the ADEA, . . . the two essential elements of a discrimination claim are that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's race, . . . national origin, [or] age."  *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008).

Defendant argues the plaintiff failed to allege facts to satisfy the first element because his applications did not involve a promotion.  *See* Def.'s Mem. at 3.  But the Court ruled that plaintiff

stated facts sufficient to allege an actionable adverse employment decision since he was not hired for the GS-13 position, Mem. Op. at 21, citing Compl. at 11 and *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009) (an adverse employment decision means "a significant change in employment status, such as hiring, firing, [and] failing to promote"), and it is undisputed that plaintiff was not hired for the position. *See* Pl.'s SOF at 8; Def.'s SOF ¶ 33.   So the first element is satisfied.

With respect to the second element, plaintiff "asserts that National Original and Age discrimination *may* be in play."  Pl.'s Opp. at 2 (emphasis added); *see also* Aff. of Bonilla, ROI at PDF Page 103 of 934 ("MS. HOLMES:  You've also alleged that your non-selection was based on your national origin and age.  Why do you believe that?  COMPLAINANT:  I don't know.  I don't know. It's just a possibility.").

When a plaintiff brings a discrimination claim under Title VII or the ADEA and relies on circumstantial evidence to establish the employer's unlawful conduct, as plaintiff does here, courts apply the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Barnette v. Chertoff*, 453 F.3d 513, 515 (D.C. Cir. 2006) (applying framework in Title VII case); *Paquin v. Fed. Nat'l Mortg. Ass'n*, 119 F.3d 23, 26 (D.C. Cir. 1997) (applying framework in ADEA case).  Under that framework, the plaintiff bears the initial burden of establishing a *prima facie* case. *McDonnell Douglas*, 411 U.S. at 802; *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006).  Once a *prima facie* case is established, the burden "shift[s] to the employer to articulate some legitimate, nondiscriminatory reason" for the adverse action. *McDonnell Douglas*, 411 U.S. at 802; *Holcomb*, 433 F.3d at 896.  If a legitimate, nondiscriminatory reason is given, the burden shifts back to the plaintiff to prove that the proffered

reason is a pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804; *Holcomb*, 433 F.3d at 901.

Where a defendant proffers a legitimate, non-discriminatory reason for the adverse action, the court need not conduct the threshold inquiry into whether the plaintiff established a *prima face* case of discrimination. *Brady v. Off. of the Sargent at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) ("In a Title VII disparate-treatment suit where an employee has suffered an adverse employment action and an employer has asserted a legitimate, nondiscriminatory reason for the decision, the district court need not—and should not—decide whether the plaintiff actually made out a *prima facie* case under *McDonnell Douglas*.").

A plaintiff can meet his burden to establish pretext by providing evidence from which a reasonable jury could find that the employer's proffered, lawful reasons for acting are "unworthy of credence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 143 (2000). Showing pretext, though, "requires more than simply criticizing the employer's decisionmaking process." *Hairston v. Vance-Cooks*, 773 F.3d 266, 272 (D.C. Cir. 2014). It is not sufficient to "show that a reason given for a job action [was] not just, or fair, or sensible," nor is it sufficient to challenge "the correctness or desirability of [the] reasons offered." *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (internal quotation marks omitted).

In sum, "to survive summary judgment the plaintiff must show that a reasonable jury could conclude that she was [subject to an adverse action] for a discriminatory reason." *Waterhouse v. Dist. of Columbia*, 298 F.3d 989, 992 (D.C. Cir. 2002), citing *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1290 (D.C. Cir. 1998).

## I.    Defendant proffers a legitimate, non-discriminatory reason for not hiring plaintiff.

Defendant has proffered a legitimate, non-discriminatory reason for not hiring Bonilla for the testing coordinator position:  the Resume Review Committee – which did not include the

alleged discriminator Rosenbaum or his subordinates Majeed and Yi – reviewed the applications and recommended interviewing six candidates whom they concluded were better qualified than Bonilla, and "best qualified for the job, based on the written job description and posting."  Email from Frank to Majeed and Yi, copying Herbig, Larry, and Lewton (Oct. 7, 2014), ROI at PDF Page 848 of 934; *see* Def.'s Mem. at 3.

## II.   Plaintiff fails to provide evidence from which a reasonable jury could conclude he was not interviewed or hired for a discriminatory reason.

Bonilla contends that discriminatory animus was behind HCE's decision not to interview or hire him.  He cites no direct evidence indicating that his race, national original, or age played a role in HCE's decision, but points to numerous emails in the Record of Investigation of his September 2014 EEO case to support his claims.  Defendant argues that there is insufficient evidence to enable a juror to conclude that the agency's proffered explanation is just a pretext for discrimination or retaliation, Def.'s Mem. at 25, and the Court agrees.  A review of the ROI shows that plaintiff's characterizations of the record are inaccurate, and that the material cited does not supply evidence from which a reasonable jury conclude he was not interviewed or hired for a discriminatory reason.

### A.   Excellent Reviews

Plaintiff first argues that "all that is needed for promotion is a 'successful' review, according to Human Resources," Pl.'s Opp. at 3, and because he had received higher "excellent" reviews in the past, HCE's stated basis for the decision not to hire him must be pretextual.  Compl. at 10.  He cites no evidence to support this assertion, but even if it were true, his being hired for the testing coordinator job involved more than being eligible for a grade promotion; it involved a transfer from his non-testing job in the Office of Special Counsel to a testing job in HCE and competing with other applicants – with more recent testing experience – for the position.  So the

hiring decision was based not only on whether he had achieved a "successful" performance review for his past performances in HCE and at different jots in other sections, but also how his qualifications and experience relevant to the particular position compared to those of other applicants.  The mere fact that Bonilla had received "excellent" performance reviews in the past does not indicate that HCE denied him the testing coordinator job for discriminatory reasons.

###### B.    Rosenbaum's Statement

Plaintiff next argues that HCE Section Chief Steven Rosenbaum poisoned his 2014 applications by telling Shina Majeed during Open Season that Bonilla's "performance did not qualify him for a promotion to GS-13 during his past employment with the Section" — the purported "not-so veiled command" not to hire him.  Pl.'s Opp. at 3.  He claims Rosenbaum made the statement because he knew about Bonilla's protected activity in 2009.  Compl. at 10; Pl.'s Opp. at 4.  This does not bear on age or race discrimination.

In its ruling on the motion to dismiss, the Court held that the connection between plaintiff's 2009 protected activity and Rosenbaum's 2014 statement was too attenuated as a matter of law to establish the but-for causal relationship need for a retaliation claim.  Mem. Op. at 12–14.  But it held that plaintiff had alleged sufficient facts to overcome the motion to dismiss as to the public hiring process application.[5]  Mem. Op. at 22, quoting *Staub v. Proctor Hosp.*, 562 U.S. 411, 415 (2011) (explaining that the "cat's paw" theory provides that an employer may be liable "for the animus of a supervisor who was not charged with making the ultimate employment decision").

Under the cat's paw theory of liability, a plaintiff may demonstrate discrimination by showing that "a supervisor performed an act motivated by discriminatory animus, that was

---

5      The Court dismissed the claim as to the Open Season application because plaintiff failed to exhaust his administrative remedies.  Mem. Op. at 15–19.

intended by the supervisor to cause an adverse employment action, and . . . that act is a proximate cause of the ultimate employment action." *Staub*, 562 U.S. at 411 (edits omitted). With the benefit of the record at the summary judgment stage of the case, the Court finds that Bonilla has failed to provide evidence from which a reasonable jury could find discrimination under the cat's paw theory.

Rosenbaum stated in a sworn affidavit that he made the statement to Majeed about Bonilla's not being promoted before because he considered "the issue . . . relevant to [Plaintiff's] qualifications" for the position. Def.'s SOF ¶ 26; *see* Second Aff. of Steven Rosenbaum (Jun. 12, 2015) [Dkt. # 36-1] at 6. So it is true that he passed that information along to be taken into consideration by the 2014 decision makers. But what is missing is the evidence that there was any unlawful bias underlying the 2010 decision regarding plaintiff's grade, or Rosenbaum's decision to inform Majeed about that assessment when plaintiff was seeking to move to a testing coordinator position with a grade 13 designation. At the summary judgement stage, plaintiff must do more than surmise.

Rosenbaum's statement was not discriminatory on its face, and it was factually accurate. Bonilla was not promoted from GS-12 to GS-13 during his prior stint in HCE – or thereafter. *See* Bonilla Resume (showing that plaintiff worked in the Housing Section, the Office of Special Counsel, and the Voting Section over four years and remained at the GS-12 grade throughout that time). Federal anti-discrimination laws "do not require [] employers [to] . . . disregard a manager's prior experiences with particular applicants." *Threadgill v. Spellings*, 435 F. Supp. 2d 126, 141 (D.D.C. 2006); *see also Stewart v. Ashcroft*, 352 F.3d 422, 429 (D.C. Cir. 2003), quoting *Dale v. Chi. Tribune Co.,* 797 F.2d 458, 464 (7th Cir. 1986) (deferring to the employer's decision of "what nondiscriminatory qualities it will seek in filling the . . . position").

Further, there is no indication Rosenbaum's statement to Majeed during the Open Season process was a proximate cause of the RRC's decision not to recommend him during the public application process since neither Rosenbaum, Majeed, nor Yi were on the committee, and there is no evidence that the statement was relayed to its members. Pl.'s SOF at 8; Def.'s SOF ¶¶ 33–34; *see Duncan v. Johnson,* 213 F. Supp. 3d 161, 193 (D.D.C. 2016) (a plaintiff cannot make out a cat's paw claim if an impartial decision maker makes an independent determination that adverse action is warranted for reasons unrelated to the alleged non-decision maker's action), *citing Staub*, 562 U.S. at 421.

Since plaintiff has not pointed to anything other than the fact that the information was conveyed, his suggestions that some bias on Rosenbaum's part thereby tainted the RRC decision fails.

### C.     The "Do Over"

Bonilla next argues that although Rosenbaum was not on the RRC, he orchestrated the "do over" with Majeed and Yi to ensure that Bonilla was not offered an interview. Pl.'s SOF at 7–8. But RRC committee member Frank, not Rosenbaum, initiated the re-evaluation. *See* Email from Yi to Rosenbaum, copying Frank and Majeed (Aug. 18, 2014), ROI at PDF Page 566 of 934.

He also contends that Rosenbaum told a "blatant lie" to HR when he asked it to re-evaluate the incoming applications because, according to plaintiff, "there were plenty of qualified applicants in the original DEU *and MPP certificates*." Pl.'s SOF at 8 (emphasis added). But no one said there were not qualified applicants in the MPP certificate – the issue was the DEU certificate. *See* Email from Yi to Rosenbaum, copying Frank and Majeed (Aug. 18, 2014), ROI at PDF Page 566 of 934.

Further, there is no evidence that Rosenbaum or Yi knew who the RRC intended to recommend when they raised concerns about the DEU certificate. Plaintiff claims that the RRC "did

recommend Bonilla for an interview."  Pl.'s Opp. at 5, citing Pl.'s Ex. E.  But the emails plaintiff relies on show only that the committee *discussed among themselves* whether to recommend Bonilla.  The August 7, 2014 email among the committee members shows that two of the four committee members wanted to include Bonilla on the list of candidates, but there is no indication as to whether the others agreed.  Pl.'s Ex. E.  The August 7, 2014 email from the committee to Yi advised that it had a list of seven candidates, without identifying them.  *Id.*  And the August 12, 2014 email from Yi to the committee shows that no recommendations had been made as of that date.  *Id.*  Thus, there is no indication that Yi or Rosenbaum knew whether Bonilla was on the RRC short list when they requested the "do over."  Aff. of Rosenbaum at 10; Ex. F to Def.'s Mot., Second Aff. of Yi (May 1, 2015) at 10.

In any event, the "do over" of the DEU certificate could not, and did not, have an effect on Bonilla's candidacy because he applied for the job under both the DEU and the MPP job announcements, he was included in HR's second round of qualified candidate resumes after the "do over," and he remained under serious consideration by the Resume Review Committee until the very end.

### D.    "Fresh Blood"

Bonilla further claims that HCE management sought to undermine his application on discriminatory grounds by introducing "a new requirement for hiring that was not listed on the job announcements (namely that the person hired had not previously worked for HCE's Fair Housing Testing Program)," causing the RRC to reconsider their review and disagree on whether to recommend him.  Pl.'s Opp. at 5; *see also* Compl. at 11 ("Defendant discriminated against Plaintiff Bonilla by repeatedly introducing the 'new blood' element to the Resume Review Committee").  But the record does not support this assertion, either.

In August, when Yi raised concerns about the first the DEU certificate, he told HR that the best qualified applicants are "those who have had prior experience working as a fair housing test coordinator."  Email from Yi to Rosenbaum, copying Frank and Majeed (Aug. 18, 2014), ROI at PDF Page 566 of 934.  He did not define the required experience in any way or exclude those with past experience in HCE's Fair Housing Testing Program.

In October, the Resume Review Committee sent a list of seven candidates to Yi and Majeed, advising that they were primarily recommending applicants who worked for state and local testing groups because "*we* feel it would be better to interview applicants with 'fresh blood.'" *See* Pl.'s Ex. M, Email from Frank to Majeed and Yi, copying Herbig, Larry, and Lewton (Oct. 2, 2014) (emphasis added).

Plaintiff argues that Frank's email "reveals that they were instructed to search for 'fresh [b]lood' and that is why they disqualified Bonilla and other applicants who had worked for HCE Testing Unit before."  Pl.'s SOF at 8.  But management promptly told the committee that this was not what it wanted:  "We should be interviewing the candidates who are best qualified for the job, based on the written job description and posting, *irrespective of whether or not they worked here before*."  Pl.'s Ex. M, Email from Majeed to Frank and Yi, copying Herbig, Larry, and Lewton (Oct. 2, 2014) (emphasis added).  She asked the committee to go back and review the applicants with this in mind.  So the emails indicate it was the committee, and not management, that initially found it appropriate to identify candidates who could bring a "fresh approach."

To be sure, the emails show there was some lingering confusion among the RRC members on this point, but neither party has directed the Court to any evidence explaining *why* the RRC thought it was supposed to look for candidates with a new or fresh perspective.  The evidence shows only that management consistently told both HR and the RRC – which were the entities responsible for

identifying the qualified candidates and recommending which qualified candidates to interview – that it wanted applicants with testing experience regardless of where they gained it.

Bonilla dismisses Majeed's October 2 email directing the RRC to re-review the applications because "the well was poisoned already." Pl.'s SOF at 8.  But it was her instruction that put candidates who had previously worked for HCE's Fair Housing Testing Program, like Bonilla, back into play. *See* Pl.'s Ex. M, Oct. 6–7, 2014 emails of committee members; Email of Herbig to Frank, Lewton, and Larry (Oct 7, 2014), ROI at PDF Page 827–28 of 934 ("[B]ased only on the job announcement requirements and the resumes submitted, then I believe we are obligated to recommend Bonilla instead of [the other candidate].  Although, he would not be my candidate based on past job performance, that is not what was asked of us in reviewing the applications (as clarified by Shina)."

Finally, the Court notes that it is the Resume Review Committee's use of the term "fresh blood" in the October 2 email that underlies plaintiff's age discrimination claim.  *See* Compl. at 7, 11. Courts have held that similar terms are not "inherently ageist," *Gold v. Gensler*, 840 F. Supp. 2d 58, 68–69 (D.D.C. 2012) (summary judgment case involving direction to look for applicants with "fresh perspective and new energy"), citing *Threadgill*, 435 F. Supp. 2d at 140 (summary judgment case finding nothing discriminatory about a manager's desire to bring "new blood" to a team).  But more importantly, the email traffic reflects that the reviewers were using the term to differentiate test coordinators with experience in the federal HCE section of the Department from other experienced test coordinators, a differentiation that would not necessarily track with age.  Thus, while use of the term "fresh blood" could, on its face, give rise to concerns that it might refer to younger candidates, the Court finds that plaintiff has not come forward with the evidence that would enable a juror to conclude that age discrimination was at work when the term is viewed in context.

\* \* \*

24

At bottom, the evidence shows that HCE did not interview Bonilla because the Resume Review Committee members – some of whom favored listing Bonilla – concluded that six other candidates were better qualified for the position than either plaintiff or their other candidate for the seventh slot.  Aff. of Frank, ROI at PDF Page 280 of 934; Aff. of Lewton, ROI at PDF Page 340–41 of 934 ("[Bonilla] was definitely a contender . . .  I think he just missed that cut of however many people we wanted to range it in, like if it were six people, he might've been the seventh or eighth person . . . it was just there were people who were better qualified.").  Even the committee member who most strongly advocated in favor of recommending him acknowledged reservations about his work as a tester.  *See* Aff of Herbig, ROI at PDF Page 314–15 of 934.  The evidence shows the committee members seriously debated whether to put Bonilla forth as a seventh candidate, but it also shows that they were unanimous that he did not make their top six.

Plaintiff cites no evidence that race, national origin, or age discrimination was behind this decision or that defendant's reason for not hiring him was a pretext for discrimination.  Indeed, plaintiff himself could not offer any reason why he believed his non-selection was based on his national origin or age.  *See* Aff. of Bonilla, ROI at PDF Page 103 of 934.  A review of the record shows no basis why a reasonable jury could either.

Based on the record of this case, including the more than 4,000 pages of exhibits submitted by plaintiff, the Court finds that plaintiff has presented no evidence to give rise to a genuine dispute of any material fact.

**CONCLUSION**

For the foregoing reasons, the Court will grant defendant's motion for summary judgment [Dkt. # 23] and the deny plaintiff's cross-motion for summary judgment [Dkt. # 27].  A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE: September 29, 2023